UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN ISAAC HARRIS,                              Case No. 16-11162

            Plaintiff,                    Robert H. Cleland
v.                                              United States District Judge

MIKE MORRIS, *et al.*,                          Stephanie Dawkins Davis
                                                United States Magistrate Judge
            Defendants.
_____/

**REPORT AND RECOMMENDATION**
**MOTION TO DISMISS (Dkt. 7)**

## I.    PROCEDURAL HISTORY

Plaintiff filed this civil rights complaint against a number of defendants

employed by or associated with Eastern Michigan University.  (Dkt. 1).  All

defendants filed a motion to dismiss the complaint on April 25, 2016.  (Dkt. 7).

Plaintiff filed a response and defendants filed their reply.  (Dkt. 12, 13).  Plaintiff

also filed a sur-reply, without leave of court, which will not be considered.  (Dkt.

15).  On May 3, 2016, District Judge Robert H. Cleland referred the motion to

dismiss to the undersigned for report and recommendation.  (Dkt. 10).  The Court

has determined that oral argument in this matter is not necessary.  (Dkt. 14).  This

matter is now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that

defendants' motion to dismiss be **GRANTED** and that plaintiff's complaint be

**DISMISSED** with prejudice.

## II.    FACTUAL BACKGROUND

Although plaintiff's complaint is not a model of clarity, it appears that

plaintiff, who is a graduate student at Eastern Michigan University (EMU),

studying for a Master's of Public Administration degree (Dkt. 1, ¶ 2), is

complaining about the grades he received in two courses.  The first course, PLSC

630, was taught by defendant Dr. Raymond Rosenfeld in the Winter 2014 term

(Dkt. 1, ¶¶ 14, 34), and plaintiff received a grade of C+.  The second course, PLSC

677 was taught by defendant Dr. Gregory Plagens in the Fall 2014 term (Dkt. 1,

¶ 36), and plaintiff received a grade of C.  Because plaintiff's degree program

requires students to earn at least a B in the subject classes, he is forced to repeat

the two courses.

After plaintiff voiced his concerns surrounding his C+ grade in PLSC 630,

Dr. Rosenfeld agreed to re-grade one of plaintiff's assignments, which would have

resulted in a grade of B-.  (Dkt 1, ¶ 86).  However, plaintiff believed that a higher

grade was warranted and opted instead to participate in EMU's Grade Grievance

Procedure for PLSC 630.  Plaintiff was unsuccessful in appealing his C+ grade.

(Dkt. 1, ¶ 244).  According to defendants, plaintiff failed to timely invoke the

Grade Grievance Procedure with regard to the second class (PLSC 677), but

2

plaintiff maintains that defendants prevented him from initiating or completing that procedure.

Plaintiff also takes issue with Dr. Rosenfeld's and Dr. Plagens' criticism about his writing ability. For instance, in an e-mail on February 10, 2014, Dr. Rosenfeld advised plaintiff that his paper was in need of a complete edit and that it was so poorly written that he was barely able to evaluate the substance of what plaintiff presented. Dr. Rosenfeld also suggested that plaintiff find someone to help him edit his work. (Dkt. 1, ¶ 61). In another e-mail on October 13, 2014, Dr. Plagens advised plaintiff that his writing was difficult to read, and suggested that plaintiff address his writing weakness by seeking help from EMU's Writing Center. (Dkt. 1, ¶ 180).

Besides availing himself of the Grade Grievance Procedure for PLSC 630, plaintiff also took his concerns to the University's Office of Ombudsman. (Dkt. 1, ¶¶ 35, 149). Additionally, plaintiff went to the University's Office of Diversity & Affirmative Action ("ODAA"). (Dkt. 1, ¶¶ 158, 159, et. seq.). The ODAA advised plaintiff following its investigation, that it did not find support for his claim of harassment or discrimination, or that the Grade Grievance procedures were not followed. (Dkt. 1, ¶¶ 171, 172, 248). Plaintiff claims that the defendants' actions violated his rights under the Equal Protection Clause, the Due Process Clause and the First Amendment of the United States Constitution, and he

sues each defendant in both an individual and official capacity.

## III.   ANALYSIS AND CONCLUSION

### A.   <u>Standard of Review</u>

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must first comply with Rule 8(a)(2), which requires "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   The United States Supreme Court raised the bar for pleading requirements beyond the old "no-set-of-facts" standard of *Conley v. Gibson*, 355 U.S. 41, 78 (1957), that had prevailed for the last few decades. *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Twombly*, 550 U.S. at 555. In *Iqbal*, the Supreme Court explained that a civil complaint only survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678.   The Sixth Circuit observed that this new standard is designed to screen out cases that, while not utterly impossible, are "implausible." *Courie*, 577 F.3d at 629.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678.  And although the Court must accept all well-pleaded factual allegations in the complaint as true, it need not "'accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see also Iqbal*, 556 U.S. at 678.  The Sixth Circuit noted that "[e]xactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice."  *Courie*, 577 F.3d at 629.

Where a plaintiff is proceeding without the assistance of counsel, the court is required to liberally construe the complaint and hold it to a less stringent standard than a similar pleading drafted by an attorney.  *See e.g. Simmons v. Caruso*, 2009 WL 2922046, at *4 (E.D. Mich. Sept. 8, 2009) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972); *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999)).  Thus, the Court must read plaintiff's *pro se* complaint indulgently and accept plaintiff's allegations as true, unless they are clearly irrational or wholly incredible.  *Denton v. Hernandez*, 504 U.S. 25, 33 (1992); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (finding that the Court of Appeals improperly departed "from the liberal pleading standards set forth by Rule 8(a)(2)" and failed to "liberally construe" the *pro se* complaint at issue).

B.    § 1983 "Person" and Eleventh Amendment Immunity

Defendants contend that faculty members, the student defendants and other

5

defendants in this lawsuit cannot be sued in either their "official" or individual

capacities, because they are not officers of the State.  According to defendants, not

everyone associated with Eastern Michigan University is considered to be a State

official.  EMU is a Constitutionally-created public institution of higher education.

EMU and its governing Board of Regents are referred to in the Michigan

Constitution as a "body corporate."  *See* Mich. Const. of 1963, Article 8, Section

6.  Therefore, it is a State entity.

Plaintiff's complaint alleges violations of 42 U.S.C. § 1983, under the Equal

Protection and Due Process Clauses of the Fourteenth Amendment and the First

Amendment Free Speech Clause.  Defendants maintain that all of the individual

defendants who are State officials, acting in their official capacities, are not

"persons" subject to suit under 42 U.S.C. § 1983.  Additionally, individual

defendants acting in their official capacities are entitled to dismissal of plaintiff's

equal protection and due process claims, because those claims are barred by

Eleventh Amendment immunity.  Defendants further advance that the individual

defendants who do not qualify as State officials are entitled to have the claims

against them dismissed.  According to defendants, if they are not State officials,

then they cannot be sued for alleged constitutional violations in either an official

or an individual capacity.  Defendant posits that faculty members who are not

Deans or Department Chairs – Dr. Joseph Ohren, Dr. Raymond Rosenfeld, Dr.

Gregory Plagens, Dr. Jeffrey L. Bernstein, Dr. Judith S. Kulberg, Dr. Joan Jones, Nancy Byrk, Dr. Edward Sidlow, Dr. Catherine Peterson and Joseph Engwenyu - are not State officials because none of them are officers or Regents of the University or high level administrators or managers. Similarly, defendant Tanesia K. White, who worked in the Office of Diversity & Affirmative Action, is not a State official. Defendants argue that plaintiff does not allege that any of these individuals had authority to set policy, that they supervised other employees, or that they had any authority to hire, fire or discipline other employees.[1] This would be especially true for the student defendants in this case – Darwin Kenneth Roche, Joseph Martinez, Bradley Watkins, Brian Rakovits and Crystal Hartman, who should also have the claims against them dismissed.

Plaintiff responds that the defendants cannot hide behind the Eleventh Amendment immunity, which, in his view, does not bar his claims brought directly against Eastern Michigan University and individual defendants. He asserts that this Court has jurisdiction over his claims because Congress provided 42 U.S.C.

---

[1] Defendants cite no authority for the proposition that faculty members and other employees of the university, while acting in their official capacity, are not "officials" of the state and a cursory search by the undersigned turned up no support. The rationale articulated seemingly conflates the concepts applied to corporate liability in the context of private actors with the accountability of public sector employees whose sole source of authority derives from the state. The cases cited herein, finding that amongst other specified groups, "employees" of the state are entitled to Eleventh Amendment immunity when sued in their official capacity, tends to suggest otherwise. However, in view of the Court's recommendation concerning both immunity and failure to state a claim, it is unnecessary to resolve this specific assertion.

§ 1983 as a method for seeking relief against a state official for a federal constitutional violation.  Plaintiff seeks injunctive, declaratory, and monetary relief in his complaint.  (Dkt. 1, Pg ID 3, 7, 71-72, 76-78).

 1.   EMU and Employees Acting in Official Capacity Not
  "Persons" under § 1983

As an initial matter, as defendants correctly state, Eastern Michigan University is a public university, the creation and governance of which is enshrined in the Michigan Constitution.  As such, it is properly classified as an arm of the state, and a suit against any of its employees in their official capacity is the same as a suit against the state itself.  Yet, the state is not a "person" within the meaning of 42 U.S.C. § 1983.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 64 (1989) (concluding that a state, its agencies, and its officials sued in their official capacities for monetary damages are not considered persons for the purpose of a § 1983 claim).  Therefore, EMU, its officials and employees when sued in their official capacity, are not susceptible to suit under the statute.[2]

---

[2] Defendants argue that the student defendants are not state actors, and thus, not subject to suit under 42 U.S.C. § 1983.  Indeed, it is true that purely private conduct is not actionable under the statute.  *See Brentwood v. Tenn. Secondary School Athletic Ass'n*, 531 U.S. 288, 295 (1989); *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999) (Section 1983 is not implicated by "merely private conduct, no matter how discriminatory or wrongful.").  Yet, under certain circumstances - for instance where a private actor jointly participates with a state in alleged constitutional wrongdoing - the private actor is engaged in state action.  *See e.g.*, *Dennis v. Sparks*, 449 U.S. 24 (1980).  The undersigned finds the briefing on this issue insufficient to reasonably conclude one way or another on this issue.  Yet, because plaintiff's claims fail on the merits, the Court need not resolve the issue.

2. <u>Eleventh Amendment Bars Damages Against Defendants in Official Capacity</u>

Complementally, under the Eleventh Amendment to the U.S. Constitution, a state and its agencies may not be sued in federal court, regardless of the relief sought, unless the state has waived its immunity or Congress has overridden it. *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). Public universities in the state of Michigan are entitled to Eleventh Amendment immunity. *See Estate of Ritter v. Univ. of Mich.*, 851 F.2d 846, 849 (6th Cir. 1988) (University of Michigan is an arm of the state); *Komanicky v. Teachers Ins. & Annuity Ass'n*, 230 F.3d 1358 (6th Cir. 2000) (unpublished) (WSU's Board of Governors is an arm of the state). And, in enacting § 1983, Congress did not intend to override the traditional sovereign immunity of the states. *Whittington v. Milby*, 928 F.2d 188, 193-94 (6th Cir. 1991) (citing *Quern v. Jordan*, 440 U.S. 332, 341 (1979)); *see Ferritto v. Ohio Dep't of Highway Safety*, 1991 WL 37824, at *2 (6th Cir. Mar. 19, 1991) ("The Eleventh Amendment prohibits actions against states and state agencies under section 1983 and section 1985.").

Eleventh Amendment immunity extends to damages claims against state officials sued in their official capacity. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) ("This [Eleventh Amendment] bar remains in effect when State

officials are sued for damages in their official capacity."); *McCrary v. Ohio Dep't of Human Servs.*, 2000 WL 1140750, at *3 (6th Cir. Aug. 8, 2000) (finding § 1983 and § 1985 claims against state agency and its employees in their official capacities for damages barred by Eleventh Amendment immunity).  Since EMU is a public university of the State of Michigan, official capacity claims for monetary claims against any defendant  who is an employee of EMU, are barred by Eleventh Amendment immunity.  *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Thomas v. Noder-Love*, 2015 WL 4385284, at *5 (6th Cir. July 17, 2015) ("It is also well-settled that [Eleventh Amendment] ... immunity applies to claims under § 1983, meaning that states and state officials sued in their official capacity are not considered 'persons' under § 1983 and, therefore, cannot be sued for money damages without the state's consent.").

### 3. Exception for Prospective Relief Inapplicable

*Ex parte Young*, 209 U.S. 123 (1908), provides an exception to Eleventh Amendment immunity for claims seeking injunctive relief against individual state officials in their official capacities.  As explained in *Carney v. Univ. of Akron*, 2016 WL 4036726, at *13 (N.D. Ohio July 28, 2016), the exception applies where a plaintiff seeks prospective relief to end an alleged continuing violation of federal law.  *See MacDonald v. Vill. of Northport, Mich.*, 164 F.3d 964, 970-72 (6th Cir. 1999); *Brown v. Strickland*, 2010 WL 2629878, at *4 (S.D. Ohio June 28, 2010)

10

("a declaratory judgment against state officials declaring that they violated federal law in the past constitutes retrospective relief, and is barred by the Eleventh Amendment") (citing *Green v. Mansour*, 474 U.S. 64, 68 (1985)); *Marshall v. Ohio Univ.*, 2015 WL 7254213, at *13 (S.D. Ohio Nov. 17, 2015) (university officials were entitled to Eleventh Amendment immunity for constitutional claims brought against them in their official capacities, notwithstanding request for injunctive relief, where no ongoing violation alleged).

In this case, while plaintiff makes vague requests to enjoin defendants from enforcing their policies against him and to preclude retaliation against him based on his "academic freedom beliefs" and correct his grades, these requests do not appear to be part of any alleged ongoing constitutional violation. Rather, the request for a change in grades relates to past conduct, not prospective equitable relief. Consequently, there does not appear to be any viable claim for injunctive relief under *Ex Parte Young*, which applies only if "the relief sought is ... equitable and prospective." *Westside Mothers v. Haveman*, 289 F.3d 852, 860 (6th Cir. 2002). Moreover, as discussed more fully below, plaintiff's purported right to "academic freedom" is not implicated in this case.

C.    Due Process/Qualified Immunity

Defendants contend that they are also entitled to have the claims against them dismissed because plaintiff received legally sufficient due process, as

11

demonstrated by plaintiff's own allegations in the Complaint.  Specifically,

plaintiff acknowledges that he was given an opportunity to participate in the Grade

Grievance Procedure regarding PLSC 630.  He had an opportunity before a

decision was made to submit a statement of his version of events.  Plaintiff also

went to the University's Office of Ombudsman and the Office of Diversity and

Affirmative Action.

As described in *Stephenson v. Central Michigan University*, 897 F.Supp.2d

556, 568 (E.D. Mich. 2012), to determine if a plaintiff has established that his or

her procedural due process rights have been violated, the court must engage in a

two-step inquiry.  The court must first determine whether the state has interfered

with a liberty or property interest, and second, whether the procedure used to

deprive Plaintiff of such interest was constitutionally sufficient.  *Id*. (citing *Yohn v.*

*Coleman*, 639 F.Supp.2d 776, 787 (E.D. Mich. 2009)).  The fundamental elements

of procedural due process are notice and an opportunity to be heard.  *Yohn*, 639

F.Supp.2d at 788 (quoting *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357

(6th Cir. 1992)).

*Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 98

(1978), establishes the standard for procedural due process in the context of

academic decisions.  There, the plaintiff was dismissed for academic reasons

without receiving a hearing.  *Id*. at 79-80.  The Court, without deciding whether

12

the plaintiff had a protected liberty or property interest in continuing her education, rejected her argument. The Court held that, when dismissing a student for academic reasons, a university need not hold a hearing. *Id*. at 85, 89-91. A university meets the requirements of procedural due process so long as the dismissal decision is "careful and deliberate." *Id*. at 85.

Notably, neither the Sixth Circuit nor the Supreme Court has held that a higher education student has a property right or liberty interest in a particular grade. One court has even concluded that such a claim would be so frivolous as to probably deprive it of subject matter jurisdiction. *Feine v. Parkland Coll. Bd. of Trustees*, 2010 WL 1524201, at *8 (C.D. Ill. Feb. 25, 2010), report and recommendation adopted, 2010 WL 1524168 (C.D. Ill. Apr. 14, 2010). Most courts, however, follow the Supreme Court's lead in *Horowitz* in assuming that a protected liberty or property right is at issue, and assess whether sufficient procedural due process was afforded. *See e.g.*, *Oyama v. Univ. of Hawaii*, 2013 WL 1767710 (D. Haw. Apr. 23, 2013), aff'd, 813 F.3d 850 (9th Cir. 2015); *Burnett v. Coll. of the Mainland*, 994 F.Supp.2d 823 (S.D. Tex. 2014); *Smith v. Odessa Junior Coll. Dist. Individually*, 2014 WL 12558000, at *4 (W.D. Tex. Jan. 14, 2014); *Shah v. Univ. of Texas Sw. Med. Sch.*, 54 F.Supp.3d 681, 694 (N.D. Tex. 2014); *Hodge v. Coll. of S. Maryland*, 121 F.Supp.3d 486, 500 (D. Md.

13

2015).[3]  "Moreover, there is no case law precedent for the proposition that a college student has a substantive due process right to continue her studies.  To the contrary, case law has noted that 'concerns of federalism, judicial capacity, and academic freedom counsel against the recognition of such an interest.'" *Rogers v. Tennessee Bd. of Regents*, 2007 WL 738146, at *10 (E.D. Tenn. Mar. 7, 2007), aff'd, 273 Fed. Appx. 458 (6th Cir. 2008) (quoting *Bell v. Ohio State*, 351 F.3d 240 (6th Cir. 2003)) (citing *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 222 (1985)).  Indeed, university faculties are given the widest range of discretion "in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Horowitz*, 435 U.S. at 96 n. 6.  The courts are "particularly ill-equipped to evaluate academic performance." *Id*. at 92.

Following the procedural due process analysis for academic decisions by universities set forth in *Horowitz*, and even assuming arguendo that plaintiff had a constitutionally protected right, he was afforded adequate procedural due process, as described in the complaint.  As set forth in detail in the Complaint, plaintiff received notice of the basis of his grade in PLSC 630.  (*See e.g.*, Dkt. 1, ¶¶ 18, 61, 62, 79).  He also received information from Dr. Plagens about his work and grade

---

[3] Reconsideration denied, 2015 WL 5201880 (D. Md. Sept. 4, 2015), aff'd sub nom. *Hodge v. Coll. of S. Maryland (CSM)*, 646 Fed. Appx. 294 (4th Cir. 2016), cert. dismissed sub nom. *Hodge v. Coll. of S. Maryland*, 137 S. Ct. 504 (2016), reconsideration denied in part, 2017 WL 160452 (U.S. Jan. 17, 2017), and aff'd sub nom. *Hodge v. Coll. of S. Maryland (CSM)*, 646 Fed. Appx. 294 (4th Cir. 2016), and cert. dismissed sub nom. *Hodge v. Coll. of S. Maryland*, 137 S. Ct. 504 (2016), and reconsideration denied in part, 2017 WL 160452 (U.S. Jan. 17, 2017).

in PLSC 677.  (Dkt. 1, ¶¶ 190-196).   Though apparently familiar with the

procedure, it appears that plaintiff did not invoke the Grade Grievance Procedure

with regard to PLSC 677.  (Dkt. 1, ¶ 246).  Plaintiff's complaint admits that he had

an opportunity to be heard about the grading in PLSC 630 by invoking the

University's Grade Grievance Procedure, and Harris recites that Dr. Rosenfeld met

with him on June 6, 2014.  (Dkt. 1, ¶¶ 14, 80).  Plaintiff further acknowledges that

"the meeting started out with me being allowed to provide my objections

regarding some of Professor Raymond A. Rosenfeld's derogatory remarks from

the first Memo/email he sent to me."  (Dkt. 1, ¶ 80).  Next, plaintiff refers to an

e-mail he received from defendant Dr. Arnold Fleishmann, Chair of the Political

Science Department at EMU, in which Dr. Fleishmann advised plaintiff that Dr.

Rosenfeld had graded an assignment that was previously ungraded), which would

have changed Harris's grade for the course from a C+ to a B-.  (Dkt. 1, ¶¶ 85, 86).

Plaintiff remained unsatisfied, so he proceeded to Step II of the Grade Grievance

Procedure.  (Dkt. 1, ¶¶ 86, 87, 119, 125, 134, 135, 231).  Plaintiff's grade in PLSC

630 was not changed as a result of the Grade Grievance Procedure, which

prompted him to resort to the University's Office of Ombudsman.  (Dkt. 1, ¶¶ 35,

149, 244).  In addition, plaintiff contacted EMU's Office of Diversity &

Affirmative Action ("ODAA") (Dkt 1, ¶ 159).  The ODAA advised plaintiff,

following its investigation, that it did not find support for his complaint of

15

harassment or discrimination, or that the Grade Grievance Procedure was not followed.  (Dkt. 1, ¶¶ 171, 172, 248).

In the view of the undersigned, plaintiff's due process claim as to PLSC 630 fails as a matter of law.  The allegations in the complaint demonstrate that plaintiff was given all the possible process that was due, and then some.  Thus, he has failed to state a claim for violation of his due process rights as to PLSC 630.

As to PLSC 677, plaintiff says that he attempted to invoke the grievance procedure, but "was not even allowed to get to the Step I College Grade Grievance Procedure with Defendant Plagens."  (Dkt. 1, ¶ 246).  Defendants characterize this as a failure to invoke the procedure, which suggests that plaintiff's claims fails on this basis.  *See Stephenson*,  897 F.Supp.2d at 569.  However, the undersigned reads the allegations as suggesting that defendants prevented him from pursuing the grievance procedure, which could lead to an entirely different conclusion.  Regardless, the court need not reconcile the competing interpretations as discussed in detail below, the undersigned concludes that defendants have qualified immunity as to the due process claims.

The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Caldwell*

16

*v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing that the defendant's conduct violated a right so clearly established that a reasonable official in his position would have clearly understood that he or she was under an affirmative duty to refrain from such conduct.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002) (citation omitted) (explaining that "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity").

The Supreme Court has established a two-part test in order to determine whether qualified immunity is applicable to a particular situation.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The first part of the test involves a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right."  *Id*.  If the first question was resolved in the affirmative, then the court would decide "whether the right was clearly established."  *Id*.  If both questions are resolved in the affirmative, then the doctrine of qualified immunity does not apply and the case can proceed.

The Supreme Court subsequently revisited its decision in *Saucier* and concluded that the mandatory sequencing of the two-part test for determining if qualified immunity applied was no longer sound based on several factors,

17

including judicial economy. *Pearson v. Callahan*, 555 U.S. 223, 227 (2009). While not modifying the factors that should be considered in such a decision, the Court held that sometimes it makes sense to decide the second part of the test first, and that such a decision may resolve the controversy without having to address the first part of the test. *Id.* In *Pearson*, the § 1983 claim of the plaintiff was based on an allegedly unlawful search conducted by the defendant police officers. Without having to engage in the perhaps more complicated inquiry of whether plaintiff's constitutional rights had been violated, the Court found that the constitutional right claimed by plaintiff was not clearly established. Specifically, the court concluded that lower court case law was consistent with the conduct of the officers and "principles of qualified immunity [should] shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Id.* at 244-45. "This generally means that 'we are free to consider those questions in whatever order is appropriate in light of the issues before us.'" *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009) (quoting *Moldowan v. City of Warren*, 570 F.3d 698, 720 (6th Cir. 2009)).

Under the "clearly established" prong of the qualified immunity test, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). "A clearly established constitutional violation requires

18

on-point, controlling authority or a robust consensus of cases of persuasive authority." *Ortega v. U.S. Immigration and Customs Enforcement*, 737 F.3d 435, 439 (6th Cir. 2013).  Without on-point authority, only in the most obvious of cases can an official's conduct be held to have been clearly unlawful.  *Sample v. Bailey*, 409 F.3d 689, 698-99 (6th Cir. 2005).

Moreover, defendants are not required to affirmatively disprove the existence of clearly established law, because "[t]he burden of convincing a court that the law was clearly established rests squarely with the plaintiff."  *Key v. Grayson*, 179 F.3d 996, 1000 (6th Cir. 1999).  Plaintiff "bears the ultimate burden of proof to show that the individual officers are not entitled to qualified immunity."  *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005).

Here, plaintiff relies on *Horowitz*, in which the Supreme Court expressly declined to determine that a student had a protected property or liberty interest in academic decisions (and which involved dismissal from an academic program, not merely a disagreement with grades received) along with district court decisions from Texas and Vermont.  (Dkt. 12, Pg ID 259).  Notably, in *Connelly v. Univ. of Vt. & State Agr. Coll.*, 244 F.Supp. 156 (D. Vt. 1965), cited by plaintiff, the court determined that a failing grade leading to the dismissal of the plaintiff from the medical school program, could be reviewed on the basis of arbitrary and

19

capricious action or bad faith.  In this case, plaintiff was not dismissed from the

masters program at EMU and thus, *Connelly* is distinguishable.  Again, even if

*Connelly* were directly on point, a district court opinion from Vermont would not

constitute "clearly established" precedent that would bind defendants in this case

for purposes of a qualified immunity analysis.  The same is true with respect to

plaintiff's reliance on *Sylvester v. Texas Southern University*, 957 F. Supp. 944

(S.D. Tex. 1997).  This is simply not a "robust consensus of persuasive authority,"

in the view of the undersigned.  For these reasons, defendants are entitled to

qualified immunity on plaintiff's due process claims because plaintiff has not

shown that his right to due process under these circumstances is clearly

established.

  D. <u>Equal Protection</u>

  Defendants argue that plaintiff's equal protection claim fails to state a claim

because he has not identified any similarly-situated student who engaged in

comparable behavior but who defendants Dr. Rosenfeld and Dr. Plagens, and other

defendants, treated differently.  According to defendants, plaintiff has not

identified any facts in the complaint, as opposed to conclusory allegations,

suggestive of any racially-motivated reason for the grades assigned in the two

classes.  (Dkt. 7, Pg ID 175-176).  Plaintiff's response does not address the

substance of the legal arguments raised in defendants' motion regarding the merits

20

of his equal protection claim.  (Dkt. 12).

As explained in *DeSoto v. Board of Parks and Recreation*, 64 F.Supp.3d 1070, 1090 (M.D. Tenn. 2014), the essence of an equal protection claim is disparate treatment of the plaintiff relative to others: thus, "[t]o state an equal protection claim, a plaintiff must adequately plead that the government [treats certain people] disparately as compared to similarly situated persons and that such disparate treatment either [sic] burdens a fundamental right, targets a suspect class, or has no rational basis." *Id*. (quoting *Raymond v. O'Connor*, 526 Fed.Appx. 526, 530 (6th Cir. 2013) (quoting *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011)).  "The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Raymond*, 526 Fed.Appx. at 530 (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006)).  In *DeSoto*, while the court acknowledged that the plaintiff was not obligated to plead a *prima face* case of discrimination in compliance with the *McDonnell Douglas* burden-shifting framework in the complaint, the court also held that the plaintiff could not "survive a motion to dismiss without pleading specific allegations of disparate treatment, which are essential to an equal protection claim that does involve direct allegations of discrimination." *Id.* at 1091 (citing *Raymond*, 526

21

2:16-cv-11162-RHC-SDD   Doc # 18   Filed 02/08/17   Pg 22 of 28   Pg ID 358

Fed. Appx. at 530 ("The complaint's sole reference to disparate treatment is the undeveloped assertion of a different and harsher standard of scrutiny might be applied to non-residents discussed above. Without specific allegations of disparate treatment, the district court properly dismissed Raymond's equal protection claim.").

In this case, plaintiff makes generalized claims in his complaint that white students were treated differently in class discussions by Dr. Rosenfeld. Plaintiff says he and other black students were "cut off" if they challenged Dr. Rosenfeld's positions, but white students were allowed to complete their statements. (Dkt. 1, ¶ 58). Plaintiff also suggests that he was treated differently from his class partner, defendant Darwin Roche (or at least was inappropriately penalized for his deficiencies), but he does not allege that Roche is of a different race or not in a protected class. (Dkt. 1, ¶¶ 41, 60, 75-78, 83, 98-113, 138-142, 239-240). Like the plaintiff in *DeSoto*, plaintiff here has failed to allege that defendants treated any non-black student differently from how he was treated, or that another non-black student engaged in the same conduct that he did, but was treated more favorably. *Id.* at 1091. For these reasons, plaintiff's complaint fails to state a claim for violation of the Equal Protection Clause.

E.   First Amendment

Defendants next argue that Count I of the Complaint fails to state a claim

22

and should be dismissed.  While Count I is labeled by plaintiff as a violation of the

Free Speech Clause under the First Amendment, defendants suggest that the

allegations contained in Count I have more to do with plaintiff's dissatisfaction

with the nature of the Grade Grievance Procedure, thus rendering it a due process

claim, repetitive of Count IV.  Defendants also point out that, although plaintiff

alleges in Count I that he was not supplied a copy of Dr. Rosenfeld's written

statement, he also acknowledges that defendant Associate Dean Kate Mehuron

read Dr. Rosenfeld's written statement into the record at the hearing.  Plaintiff also

complains that Dr. Rosenfeld was not present at the hearing (Dkt. 1, ¶¶ 232, 234),

and that a graduate student was present at the hearing (Dkt. 1, ¶ 233).  Defendants

argue that there is no legal or logical connection between plaintiff's complaint that

a student was allowed to be at the hearing despite plaintiff's request that the

student be excused, and the conclusion by plaintiff that EMU "by policy and

practice have discriminated against plaintiff based on the viewpoint of his

speech." (Dkt. 1, ¶ 238).  According to defendants, nowhere in the complaint does

plaintiff identify any statements he made that resulted in adverse actions against

him.  Defendants assert that there is no factual support for the assertion that EMU

by policy and practice discriminated against plaintiff based on his speech and that

plaintiff does not even identify what the purported speech was.  Plaintiff also fails

to identify any purported "prior restraint" against his exercise of his First

Amendment rights.  (Dkt. 1, ¶ 235).  Plaintiff identifies neither a policy and

practice that is overbroad, nor a "protected" First Amendment expression.  (Dkt. 1,

¶¶ 250, 251).  Thus, defendants maintain that the case is not about any protected

speech, but rather a student who did not like that his Professors criticized his

writing and gave him grades lower than what he would have liked.

In his response, plaintiff does not address the merits of defendants'

arguments regarding his First Amendment claims.  Instead, sprinkled throughout

the response, plaintiff makes statements regarding "academic freedom."  It is

unclear from the complaint how the grading process at issue here implicates the

principles of academic freedom under the First Amendment.  The Sixth Circuit in

*Johnson-Kurek v. Abu-Absi*, 423 F.3d 590, 593-94 (6th Cir. 2005) (parallel

citations omitted) explained the principles underpinning "academic freedom"

under the First Amendment and its limited scope:

> "[T]o the extent the Constitution recognizes any right of
> 'academic freedom' above and beyond the First
> Amendment rights to which every citizen is entitled, the
> right inheres in the University, not in individual
> professors." *Urofsky v. Gilmore*, 216 F.3d 401, 410 (4th
> Cir. 2000); *see also Sweezy v. New Hampshire*, 354 U.S.
> 234, 263 (1957) (Frankfurter, J., concurring) (describing
> the "four essential freedoms of a university": "to
> determine for itself on academic grounds who may teach,
> what may be taught, how it shall be taught, and who may
> be admitted to study.").  "Courts do not and cannot
> intervene in the resolution of conflicts which arise in the
> daily operation of school systems and which do not

24

directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *see also Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) ("The administration of the university rests not with the courts, but with the administrators of the institution.").

These "essential freedoms" of a university encompass the right to determine how classes are to be taught, and grades assigned:

> A nontenured professor does not escape reasonable supervision in the manner in which she conducts her classes or assigns her grades. University officials remain free to review a professor's classroom activities when determining whether to grant or deny tenure. The university may constitutionally choose not to renew the contract of a nontenured professor whose pedagogical attitude and teaching methods do not conform to institutional standards. The First Amendment concept of academic freedom does not require that a nontenured professor be made a sovereign unto himself.

> *Parate*, 868 F.2d at 827 (internal citations omitted); *see also Brown v. Armenti*, 247 F.3d 69, 75 (3d Cir. 2001) ("Because grading is pedagogic, the assignment of the grade is subsumed under the university's freedom to determine how a course is to be taught. We therefore conclude that a public university professor does not have a First Amendment right to expression via the school's grade assignment procedures.").

As further explained in *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 226 (1985), "[a]cademic freedom thrives not only on the independent and uninhibited

exchange of ideas among teachers and students, *see Keyishian* [*v. Board of Regents*], 385 U.S. 589, 603 [(1967)]; *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) (opinion of Warren, C.J.), but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself, *see University of California Regents v. Bakke*, 438 U.S. 265, 312 (1978) (opinion of Powell, J.); *Sweezy v. New Hampshire*, 354 U.S. at 263 (Frankfurter, J., concurring in result)." (Internal parallel citations omitted). Yet, nothing in these decisions or the principles they embody suggests that plaintiff, a student, has a right to academic freedom under the First Amendment pertaining to the grading process and, if he did, how any such right might have been violated by defendants. Consequently, the undersigned concludes that plaintiff's complaint fails to state a claim under the First Amendment.

      F.    <u>Count III</u>

      In their motion to dismiss, defendants assert that they are "stumped" as to how to characterize Count III of the Complaint, positing that it appears to be an amalgam of the Count I First Amendment claim and the Counts II and IV equal protection and due process claims. For example, in ¶ 266 of Count III, plaintiff writes that under the Equal Protection Clause of the 14th Amendment, the government cannot deny due process. And, in ¶ 276, plaintiff writes that pursuant to pursuant to 42 U.S.C. § 1983, defendants allegedly violated plaintiff's First

Amendment rights.  The undersigned agrees with defendants' characterization of Count III and recommends that it be dismissed for the same reasons as plaintiff's other claims, addressed in detail above.

## IV.   RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that defendants' motion to dismiss be **GRANTED** and that plaintiff's complaint be **DISMISSED** with prejudice.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and E.D. Mich. Local Rule 72.1(d).  Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2); E.D. Mich. Local

Rule 72.1(d).  The response must specifically address each issue raised in the

objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc.  If the Court determines that any objections

are without merit, it may rule without awaiting the response.

Date: February 8, 2017                    s/Stephanie Dawkins Davis
                                          Stephanie Dawkins Davis
                                          United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on February 8, 2017, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to all counsel of record and I have mailed by United States Postal Service to the following non-ECF participant: John Isaac Harris, P.O. Box 04907, Detroit, MI 48204.

                                          s/Tammy Hallwood
                                          Case Manager
                                          (810) 341-7887
                                          tammy_hallwood@mied.uscourts.gov

28